IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA22-385

Filed 18 April 2023

Yadkin County, No. 21 JA 34

IN THE MATTER OF: K.J.M.

Appeal by respondent mother from order entered 10 February 2022 by Judge
William F. Brooks in District Court, Yadkin County. Heard in the Court of Appeals
21 March 2023.

> *James N. Freeman, Jr. for petitioner-appellee Yadkin County Human Services
> Agency.*
>
> *J. Thomas Diepenbrock for respondent-appellant-mother.*
>
> *Keith Karlsson for appellee guardian ad litem.*

STROUD, Chief Judge.

Mother appeals from an order that (1) adjudicated her minor child Kevin[1] to
be a neglected juvenile and (2) entered an initial disposition. On appeal, Mother only
challenges the trial court's adjudication of Kevin as neglected. Because (1) clear and
convincing evidence supports the trial court's findings of fact, (2) those findings of fact
support the trial court's conclusions of law, and (3) the trial court did not err in its

---

[1] We use a pseudonym to protect the minor child's identity. This pseudonym was designated by the
parties in accord with North Carolina Rule of Appellate Procedure 42(b).

conclusions of law, we affirm.

## I.    Background

According to the unchallenged findings of fact, this case began on 3 August 2021 when the Yadkin County Human Services Agency ("the Agency") received a report that alleged neglect of Mother's minor child, Kevin, who was then age six. Specifically, the report alleged Mother was incarcerated and the child was in the care of Mr. S[2] who was being arrested for possession of methamphetamine. The record does not clearly establish Mr. S's relationship to Kevin, if any, beyond detailing when he was caring for Kevin. Mr. S is not Kevin's father. The trial court made an unchallenged finding that someone else, who "is deceased[,]" is Kevin's father and further found there was "no current dispute as to the child's paternity." Mr. S also does not share a last name with Mother or any other relative of Mother mentioned in the record. The only other place the record discusses Mr. S is in a summary of facts supporting the allegations in the initial juvenile petition. That factual summary indicates Mother knew Mr. S in some capacity because she knew Kevin "had been visiting with" Mr. S and knew Mr. S "use[d] substances but thought he had 'gotten clean.'"

After the Agency received the report of Kevin's neglect, a social worker went to Mr. S's home and found that the initial report was accurate; Mr. S was in the process

---

[2] We do not use Mr. S's full name to, again, protect Kevin's identity.

of being arrested on the possession charge with Kevin present at the home. Further investigation revealed Mother had been incarcerated "for a few weeks" before this incident and had placed Kevin in the care of her mother, *i.e.* Kevin's grandmother, who subsequently placed Kevin in Mr. S's care. The investigating social worker then "recognized the need to seek an alternative arrangement for" Kevin's care and visited Mother in jail to inquire about potential alternative caregivers. Mother only suggested her brother and his wife, but they "indicated they would not be able to provide care for the child." Mother did not suggest Kevin's grandmother as an alternative placement, and, even if she had, the grandmother "was deemed not to be an appropriate option as caretaker for" Kevin because she had "already left him in the care of Mr. [S], leading to the situation at hand."

As a result of that situation, on 4 August 2021, the Agency filed a juvenile petition alleging Kevin was a neglected juvenile. The petition alleged Kevin was neglected in that he "does not receive proper care, supervision, or discipline" from his "parent, guardian, custodian, or caretaker" and he "lives in an environment injurious to [his] welfare." In the section of the petition where the Agency was supposed to "[s]tate facts supporting" the neglect "allegations[,]" the Agency referenced an attachment that primarily included the same factual basis recounted above. In addition to this information, the petition included the following relevant facts in support of the neglect allegation: (a) the initial report to the Agency alleged Kevin had eczema, "but it looked like open sores in the creases of his arms and legs[;]" (b)

the social worker investigating the neglect report spoke to Mr. S in the back of a police car following his arrest and he made a number of statements about his drug use and where Kevin was during that time; and (c) Mother told the investigating social worker she thought Kevin was visiting Mr. S, but Mother said Kevin was supposed to have been returned to the grandmother's care a week before the incident.

In the factual attachment to the juvenile petition, the Agency also requested custody of Kevin with full placement authority and the ability to "seek medical attention" for Kevin for the "possible exposure to Methamphetamines" and for "his severe eczema that has gone untreated resulting in open sores on his legs and other parts of his body." Kevin later tested negative for "exposure to Methamphetamines." After he was in DSS care, Kevin was "assessed for significant Eczema and was diagnosed with Impetigo[,]" but he was given prescription treatment and he "healed well."

On the same day the Agency filed the juvenile petition, 4 August 2021, the trial court entered an "Order for Nonsecure Custody" based on a determination Kevin was "exposed to a substantial risk of physical injury or sexual abuse because the parent, guardian, custodian, or caretaker ha[d] created conditions likely to cause injury or abuse or ha[d] failed to provide, or [was] unable to provide, adequate supervision or protection." (Capitalization altered.) The trial court granted the Agency custody and directed it to place Kevin in a "licensed foster home" with a further hearing to take place on 5 August 2021. (Capitalization altered.)

The trial court held the hearing on nonsecure custody on 5 August 2021 and later entered a written order entitled "Nonsecure Custody Order and Pre-Adjudication Hearing" on 16 February 2022.[3] (Capitalization altered.) After entering findings of fact on the basis for removing Kevin that largely aligned with the facts supporting the allegation of neglect and on the Agency's "reasonable efforts" to prevent removal, the trial court concluded Kevin's "continuation in or return to" his own home was contrary to his "health, safety, and best interests." The trial court also entered conclusions on the "reasonable factual basis" for the allegations and the reasonable efforts made by the Agency. As a result, the trial court: granted the Agency "temporary legal and physical custody" of Kevin with the authority to place him "in a foster home or other appropriate placement[;]" set a schedule for visitation "contingent on the [M]other appearing in a sober state and not being incarcerated[;]" and scheduled a hearing for adjudication and disposition on 2 September 2021.[4]

After a continuance due to Mother's exposure to COVID-19, the trial court held the adjudication and disposition hearing on 16 September 2021; the Agency, Mother, and Kevin's guardian *ad litem* ("GAL") were all present and represented by counsel.

---

[3] Our record does not indicate the reason the written order was filed later. We also do not have a transcript from the 5 August 2021 hearing indicating if the trial court also made an oral ruling on these matters.

[4] While our record only contains this hearing date in a later-filed written order, the adjudication and disposition hearing took place in September 2021 with Mother and her counsel present, and the trial court made an unchallenged finding in the adjudication and disposition order that Mother was "properly served[.]"

At the hearing, the only two witnesses were a "child protective services supervisor" and a "foster care social worker" who was handling Kevin's case.

The child protective services supervisor testified, in relevant part, about the initial report the Agency received and its assessment in line with the factual summary from the unchallenged findings of fact recounted above. In addition, this witness testified the Agency sought non-secure custody because they could not "locate another relative or caretaker for" Kevin and that Mother "would be classified as the non-offending parent" in the situation because the "grandmother was the one that actually allowed the child into" Mr. S's care. Finally, this witness also attempted to testify about statements Mr. S made to the Agency social worker investigating the neglect report—which the Agency had included in its attachment to the juvenile petition providing facts in support of the neglect allegation—but the trial court sustained a hearsay objection to any testimony about Mr. S's statements.

The foster care social worker testified, in relevant part, about: Kevin's placement; the witness's interactions with Mother regarding her case plan with the Agency; Mother's release from jail by the time of the hearing, albeit with criminal charges still pending; and the lack of additional alternative placement suggestions from Mother, beyond the suggestion of her brother and his wife in the initial petition, in a pre-hearing meeting. The foster care social worker also testified the Agency was recommending a plan of reunification, with a secondary plan of custody, as well as "standard visitation[,]" which would be "biweekly" supervised visitation.

After attorneys for the parties and the GAL presented arguments on an adjudication of Kevin as a neglected juvenile, the trial court orally found, by clear, cogent, and convincing evidence, Kevin was a neglected juvenile. The trial court then moved onto disposition where the only additional evidence was the Agency's "Court Summary[.]" After hearing from attorneys for the parties and the GAL as to disposition, the trial court made an oral ruling that the plan would be reunification, the Agency would have "custody and placement authority[,]" and Mother would have "minimum biweekly" supervised visitation with discretion for the Agency to "increase, expand, or modify" that visitation as "merit[ed.]"

On 10 February 2022, the trial court entered a written "Adjudication and Disposition Order[.]" (Capitalization altered.) The trial court's initial findings of fact discussed: Kevin's birthdate and the prior history of the Agency's involvement including Kevin's current placement in a foster home; Mother and her "recent[] release from incarceration[;]" Kevin's father being deceased and the lack of dispute as to paternity; and the witnesses for the Agency at the hearing. Then, in finding of fact 8, the trial court found, by "clear, cogent, and convincing evidence[,]" (1) the facts set out above and (2) additional facts that Kevin "was not in a safe environment with Mr. [S] . . . and upon [Mr. S's] arrest was left without a caretaker of any kind." The trial court then made further findings on: the accuracy of the Agency's court report and its ability to be used to enter a dispositional order; the "reasonable efforts" the Agency used to prevent Kevin's removal and find "relatives and 'nonrelative kin'" to

provide care for Kevin; Mother's "interest in doing what is necessary to reunify with the child" following her release from jail; and a visitation plan "that would serve [Kevin's] best interests[.]" The trial court did not make findings in this order about Kevin's potential exposure to methamphetamine or Kevin's eczema or impetigo, beyond finding his skin condition "healed well" in a paragraph about his time in foster care.

The trial court then made a number of conclusions of law. First, the trial court concluded North Carolina is the home state and determined it had jurisdiction in the case. Second, the trial court concluded the "allegations in the Juvenile Petition have been proven by clear, cogent, and convincing evidence" and determined "[c]lear, cogent, and convincing evidence exists to support an adjudication of" Kevin "as neglected" because he "live[d] in an environment that [was] injurious to [his] welfare and did not receive appropriate care and supervision from [his] parent or caretaker." Further, Kevin "suffer[ed] from a physical, mental, or emotional impairment or [was] at a substantial risk of such impairment as a result of living in the injurious environment[.]" Finally, the trial court concluded it was in Kevin's best interest that the Agency have legal and physical custody with placement authority, and the Agency had made reasonable efforts to "prevent or eliminate the need for [Kevin's] placement outside of the home."

The trial court adjudicated Kevin "to be a neglected juvenile" and gave the Agency custody with placement authority. The trial court further ordered the Agency

to "continue to make reasonable efforts to reunify" Kevin with Mother, including examining another person as a potential placement, and set supervised bi-weekly visitation. On 8 March 2022, Mother filed written notice of appeal from the trial court's adjudication and disposition order.

## II. Analysis

On appeal, Mother argues "[t]he trial court erred when it concluded that Kevin was neglected[.]" Mother makes three specific contentions within this argument. First, Mother asserts "[c]ertain statements denominated as findings of fact are in fact conclusions of law and/or are not supported by clear and convincing evidence." Second, Mother argues "[t]he trial court's conclusion that the allegations in the juvenile petition have been proven by clear, cogent, and convincing evidence is not supported by the court's findings of fact." Third, Mother contends the trial court's "findings of fact do not support a conclusion that Kevin suffered from a physical, mental or emotional impairment or was at a substantial risk of such an impairment" as required to adjudicate a juvenile as neglected due to (1) the lack of proper care, supervision or discipline or due to (2) an environment injurious to the juvenile's welfare, which are the two relevant parts of the definition of "[n]eglected juvenile" for this appeal. *See* N.C. Gen. Stat. § 7B-101(15) (eff. 1 Dec. 2019 to 30 Sept. 2021) (defining "[n]eglected juvenile").

As an initial matter, because Mother only challenges the adjudicatory portion of the trial court's order, she has abandoned any challenge to the disposition portion

of the order. *See* N.C. R. App. P. 28(a) ("Issues not presented and discussed in a party's brief are deemed abandoned."). Thus, if we affirm the adjudicatory part of the order, we will also affirm the dispositional part of the order.

Returning to the issues with the adjudicatory part of the order on appeal, we first set out the standard of review. Then, we review Mother's argument as to the findings of fact. Finally, we address Mother's challenges to the conclusions of law.

## A. Standard of Review

"The role of this Court in reviewing a trial court's adjudication of neglect . . . is to determine (1) whether the findings of fact are supported by clear and convincing evidence, and (2) whether the legal conclusions are supported by the findings of fact." *In re D.S.*, ___ N.C. App. ___, ____, 879 S.E.2d 335, 343 (2022) (citations and quotation marks omitted). As to the first part of our review, "[c]lear and convincing evidence is evidence which should fully convince." *Id.* (citation and quotation marks omitted). "It is well settled that in a non-jury neglect adjudication, the trial court's findings of fact supported by clear and convincing competent evidence are deemed conclusive, even where some evidence supports contrary findings." *In re J.A.M.*, 371 N.C. 1, 8, 822 S.E.2d 693, 698 (2019) (citation, quotation marks, and brackets omitted). Further, "[u]nchallenged findings of fact are deemed supported by the evidence and are binding on appeal." *In re K.W.*, 282 N.C. App. 283, 286, 871 S.E.2d 146, 149 (2022) (citation and quotation marks omitted).

Shifting to the second part of our review, we start by examining whether the findings of fact support the conclusions of law. *See In re D.S.*, ___ N.C. App. at ____, 879 S.E.2d at 343. Then, "we review [the] trial court's conclusions of law *de novo*." *See In re K.W.*, 282 N.C. App. at 286, 871 S.E.2d at 150 ("Whether a child is neglected . . . is a conclusion of law and we review a trial court's conclusions of law *de novo*."). "Under a *de novo* review, this Court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *Id.* (citation and quotation marks omitted).

**B. Challenges to Findings of Fact**

We first address Mother's argument "[c]ertain statements denominated as findings of fact are in fact conclusions of law and/or are not supported by clear and convincing evidence." "As a general rule, the labels 'findings of fact' and 'conclusions of law' employed by the lower tribunal in a written order do not determine the nature of our standard of review" because "if the lower tribunal labels as a finding of fact what is in substance a conclusion of law, we review that 'finding' as a conclusion *de novo*." *In re V.M.*, 273 N.C. App. 294, 298, 848 S.E.2d 530, 534 (2020) (citations, quotation marks, and brackets omitted).

When deciding whether to classify a determination as a finding of fact or conclusion of law, we use the following rules. *See In re Helms*, 127 N.C. App. 505, 510, 491 S.E.2d 672, 675 (1997). "[A]ny determination requiring the exercise of judgment, *see Plott v. Plott*, 313 N.C. 63, [73-]74, 326 S.E.2d 863, [869-]70 (1985), or

the application of legal principles, *see Quick v. Quick*, 305 N.C. 446, [451]-52, 290

S.E.2d 653, 657-58 (1982)[*, superseded by statute on other grounds as recognized in*

*State v. Brice*, 370 N.C. 244, 251, 806 S.E.2d 32, 37 (2017)], is more properly classified

as a conclusion of law." *In re Helms*, 127 N.C. App. at 510, 491 S.E.2d at 675 "Any

determination reached through 'logical reasoning from the evidentiary facts' is more

properly classified a finding of fact." *Id.* (quoting *Quick*, 305 N.C. at 451-52, 290

S.E.2d at 657-58). "[T]he determination of neglect requires the application of the

legal principles set forth in . . . [North Carolina General Statute] § 7B-101(15) and is

therefore a conclusion of law." *In re Stumbo*, 357 N.C. 279, 283, 582 S.E.2d 255, 258

(2003) (brackets from original omitted and own brackets added).

Returning to Mother's arguments, all her challenges focus on a single finding

of fact, finding 8. Finding 8 provides:

> Pursuant to the aforementioned Juvenile Petition, removal of the juvenile was necessary because the juvenile was exposed to a substantial risk of physical injury because his parent, guardian, custodian or caretakers have created conditions likely to cause injury or abuse and have failed to provide or are unable to provide adequate supervision and protection for the juvenile and lack an appropriate alternative child care arrangement. Furthermore, the juvenile did not receive proper care and supervision from a parent, guardian, custodian or caretaker and lives in an environment injurious to his welfare. In this regard, the Court finds by clear, cogent, and convincing evidence as follows:
>
> > The [Agency] received a report alleging neglect of [Kevin] on August 3, 2021. The report alleged that the child's mother was incarcerated and that the

child was currently in the care of [Mr. S.] who was being arrested. Social worker [name omitted] immediately initiated the report and went to [Mr. S]'s home to find him sitting in the back of a Yadkin County Sheriff's Deputy's car, arrested for possession of methamphetamine, with the child on site. The [M]other was in fact incarcerated in the Yadkin County Jail at the time and had been for a few weeks prior to removal. Upon her incarceration, the [M]other left the child in the care of the grandmother, [name omitted]. [The grandmother] subsequently placed the child in the care of [Mr. S]. *The child was not in a safe environment with Mr. [S] at the time and upon his arrest was left without a caretaker of any kind.* [The social worker] assessed the situation and recognized the need to seek an alternative arrangement for the child's care. [Another social worker] then went to the detention center to see if the [M]other could offer an alternative arrangement for the child's care. The [M]other suggested [her brother and his wife] who had provided care for the child during previous episodes between the [Agency] and family. The [brother and his wife] indicated they would not be able to provide care for the child. The grandmother, [name omitted] was deemed not to be an appropriate option as caretaker for the child, having already left him in the care of [Mr. S], leading to the situation at hand.

[A witness for the Agency] testified that the [M]other would be classified as a non-offending parent by the agency. The [M]other's incarceration lead to her placing the child in the care of the grandmother [name omitted] for at least a few weeks' time. *[The grandmother], in her capacity as the child's caretaker, placed the child in an injurious environment in the care of [Mr. S], who was arrested for possession of methamphetamine with the child on site. [The grandmother] failed in providing the child with proper care and supervision and absent*

> *intervention from the [Agency], the child was without proper care, supervision or a caretaker of any kind.* [The grandmother] was not made a party to this action.

(Emphasis added.) Within this finding, Mother challenges the entire first paragraph and the three italicized sentences from the remaining two paragraphs.

As to each of these four sections, Mother first alleges some or all of the statements are actually conclusions of law. Specifically, Mother asserts the entire first paragraph and the following portions of the three italicized sentences above are actually conclusions of law:

- "The child was not in a safe environment with [Mr. S] at the time[;]"

- "[The grandmother], in her capacity as the child's caretaker, placed the child in an injurious environment in the care of [Mr. S;]"

- "[The grandmother] failed in providing the child with proper care and supervision[.]"

We agree with Mother the entire first paragraph and those three statements are conclusions of law because they all relate to a "determination of neglect[.]" *See In re Stumbo*, 357 N.C. at 283, 582 S.E.2d at 258 (explaining a "determination of neglect requires the application of legal principles . . . and is therefore a conclusion of law"). Under North Carolina General Statute § 7B-101(15), a "[n]eglected juvenile" is defined, in relevant part, as: "Any juvenile less than 18 years of age . . . whose parent, guardian, custodian, or caretaker does not provide proper care, supervision, or

discipline; . . . or who lives in an environment injurious to the juvenile's welfare[.]" N.C. Gen. Stat. § 7B-101(15). For either of those two parts of the definition of neglect, there must be a "physical, mental, or emotional impairment[,]" some "harm to the child[,]" or a "substantial risk" of one of those things. *In re K.J.B.*, 248 N.C. App. 352, 354, 797 S.E.2d 516, 518 (2016) (citations and quotation marks omitted). The first paragraph of finding 8 and the three sentences excerpted above involve determinations Kevin was not given "proper care, supervision, or discipline[,]" "live[d] in an environment injurious" to his welfare, or faced a "substantial risk" of harm from one of those two conditions. N.C. Gen. Stat. § 7B-101(15); *In re K.J.B.*, 248 N.C. App. at 354, 797 S.E.2d at 518. Most of the challenged language directly mirrors the language from the statute and caselaw. The only place that does not use that precise language explains Kevin "was not in a safe environment[,]" which is another way of saying he was "in an environment injurious" to his welfare. N.C. Gen. Stat. § 7B-101(15). Because these challenged portions of finding 8 are actually conclusions of law, we review them as conclusions of law alongside Mother's arguments on the conclusions of law discussed below. *See In re V.M.*, 273 N.C. App. at 298, 848 S.E.2d at 534 ("[I]f the lower tribunal labels as a finding of fact what is in substance a conclusion of law, we review that 'finding' as a conclusion *de novo*.").

The only other portions of finding 8 Mother challenges both relate to a determination Kevin did not have a caregiver after Mr. S's arrest. Specifically, Mother challenges the portions of the italicized sentences above finding "upon [Mr.

- 15 -

S's] arrest [Kevin] was left without a caretaker of any kind[,]" and "the child was without proper care, supervision or a caretaker of any kind." Mother argues any statement Kevin did not have a caretaker of any kind was "not supported by clear and convincing evidence" because Mother had placed Kevin in grandmother's care upon her incarceration and the Agency had only determined grandmother was not "an *acceptable* caretaker" due to grandmother's role in placing Kevin with Mr. S; the Agency had not shown grandmother was unavailable to be a caretaker. (Emphasis added.)

But all the evidence, as well as the other undisputed findings of fact, show Kevin would have been left home alone—or at least at Mr. S's home alone—but for DSS's intervention. Neither of Kevin's parents were available to care for him upon the Agency's filing of the petition. Mother was incarcerated, and his father was deceased. Mother had left Kevin with her mother, but the grandmother had placed Kevin with Mr. S without informing Mother she was doing so. It is also undisputed Mr. S was arrested for possession of methamphetamine, leaving Kevin with no responsible adult to care for him. Mother was unable to identify anyone to care for Kevin other than her brother and his wife, and it is undisputed they were unavailable to care for Kevin.

Whether the grandmother was an acceptable caretaker or not, there is no indication in the evidence the grandmother was available as a caretaker after the Agency became involved. While the grandmother was initially Kevin's caregiver upon

Mother's incarceration, it is undisputed the grandmother "subsequently placed" Kevin "in the care of" Mr. S. The fact the grandmother gave up care of Kevin to Mr. S indicates she was no longer in the caregiver role in which Mother had placed her at the time the Agency got involved. The fact Mother did not suggest the grandmother as a placement option when the Agency spoke with her further indicates the grandmother was not an option as a caregiver. Finally, the only reason the grandmother came up is because the Agency reviewed agency information and interviewed her because Kevin had spent time with her before. The only testimony about the results from that inquiry was that the Agency "had concerns about" the grandmother "caring for" Kevin because of her past role in placing Kevin in Mr. S's care, who was subsequently arrested for possession of methamphetamine. Notably, that testimony did not indicate the Agency had determined the grandmother was available as a caretaker for Kevin before addressing her suitability; the testimony only established the Agency determined the grandmother was not an appropriate caregiver option regardless of availability.

Additionally, to the extent Mother now argues on appeal the grandmother was an available and appropriate caretaker, we reject that argument because she argued the opposite before the trial court. Mother did not present evidence at the hearing, and her counsel argued the grandmother's conduct had "led to the removal" of the child. Mother's counsel argued, "My client made an appropriate plan. The child was supposed to stay with her mother, not with Mr. [S], with her mother. She did not

authorize her mother, at least as the testimony has been here today, for Mr.[S] to have any contact with her son." To the extent Mother contends on appeal that grandmother was an appropriate caretaker and she was actually available to care for Kevin, she is not permitted to "swap horses" on appeal to make an argument she did not make before the trial court. *See, e.g., In re B.C.T.*, 265 N.C. App. 176, 193, 828 S.E.2d 50, 61 (2019) ("[T]his Court has previously held that parties are not allowed to make different arguments on appeal than before the trial court to swap horses between courts in order to get a better mount." (citation and quotation marks omitted)).

Related to this argument, Mother also challenges the findings Kevin "was not in a safe environment with Mr. [S] at the time and upon his arrest was left without a caretaker of any kind." But the evidence supports this finding as well. There was testimony the environment Kevin was in with Mr. S was "unsafe" and Kevin "would not have a caretaker there[,]" so "another plan would need to be made." Further, the testimony at the hearing indicates the Agency went to speak with Mother, and the only placement she offered was with her brother and his wife, but they were not able to care for Kevin.

Because (1) there was undisputed testimony Mother's brother and his wife were not available as caretakers and (2) there was no evidence the grandmother was available as a caretaker after the Agency became involved, we conclude Mother's challenge to these portions of finding 8 are based on a flawed premise. Without

evidence the grandmother was available as a caretaker, the only evidence was that Kevin could not stay in the environment he was in with Mr. S due to the lack of caretaker, and Mother's brother and his wife were not available. Based on this evidence, the trial court could "logical[ly] reason[]" no other caretaker was available for Kevin. *See In re Helms*, 127 N.C. App. at 510, 491 S.E.2d at 675 (explaining "[a]ny determination reached through logical reasoning from the evidentiary facts is more properly classified a finding of fact"). We therefore reject Mother's challenge to the portions of finding 8 that state Kevin had no caretaker "of any kind" after Mr. S's arrest.

## C. Challenges to Conclusions of Law

Now that we have reviewed all Mother's challenges to the findings of fact, we address her challenges to the trial court's conclusions of law. Mother challenges two conclusions. First, Mother argues "[t]he trial court's conclusion that the allegations in the juvenile petition have been proven by clear, cogent, and convincing evidence is not supported by the court's findings of fact."

Second, Mother alleges the trial court's "findings of fact do not support a conclusion that Kevin suffered from a physical, mental or emotional impairment or was at a substantial risk of such an impairment[.]" Mother's challenge to this second conclusion relates to the trial court's conclusion Kevin was a neglected juvenile. Under both parts of the definition the Agency alleged, there must be a "physical, mental, or emotional impairment[,]" some "harm to the child[,]" or a "substantial risk"

of one of those things. *In re K.J.B.*, 248 N.C. App. at 354, 797 S.E.2d at 518; *see also* N.C. Gen. Stat. § 7B-101(15). As such, we discuss Mother's second challenge as a challenge to the conclusion Kevin was a neglected juvenile.

We examine each of these two challenged conclusions in turn to determine whether the findings of fact support them. *See In re D.S.*, ___ N.C. App. at ___, 879 S.E.2d at 343. We then review the conclusions *de novo*. *See In re K.W.*, 282 N.C. App. at 286, 871 S.E.2d at 150.

### 1. *Conclusion on Proof of Allegations by Clear, Cogent, and Convincing Evidence*

Mother first challenges the trial court's conclusion that "allegations in the Juvenile Petition have been proven by clear, cogent, and convincing evidence." Specifically, Mother argues "certain allegations in the juvenile petition were not proven" because the Agency's "petition includes statements [Mr. S] allegedly made to [a] social worker" when she interviewed him while he was in the back of the Yadkin County Sheriff's car upon his arrest. When the social worker found Mr. S in the process of being arrested, he made several statements regarding his use of methamphetamine. Those statements were mentioned in the attachment to the petition, but Mother argued before the trial court the statements Mr. S made to the social worker were hearsay, and the trial court excluded the statements on those grounds. Based on the trial court's exclusion of the statements as hearsay, Mother argues the trial court did not have evidence to support any finding about statements

Mr. S made to the social worker, as were alleged in the petition, so the trial court could not have concluded *all* of the petition's allegations "have been proven by clear, cogent, and convincing evidence."

Reading this conclusion in context of the entire order, we do not consider the trial court's conclusion—"the allegations in the Juvenile Petition have been proven by clear, cogent, and convincing evidence"—as a conclusion that every single word in the juvenile petition had been proven. Mother's argument is based upon a hypertechnical reading of this conclusion. The trial court did not make any findings of fact based upon Mr. S's statements to the social worker upon his arrest as mentioned in the petition. The trial court's findings indicate only that the social worker went to Mr. S's home and found "him sitting in the back of a Yadkin County Sheriff's Deputy's car, arrested for possession of methamphetamine, with the child on site." The social worker also discovered Mother was incarcerated and "had been for a few weeks prior to removal." The social worker "assessed the situation and recognized the need to seek an alternative arrangement for the child's care." None of these findings are based upon the excluded hearsay evidence, and Mother did not challenge these portions of the findings are unsupported by the evidence.

Under North Carolina General Statute § 7B-807(a), the trial court is required to state it has made its findings by "clear and convincing" evidence:

> If the court finds from the evidence, including stipulations
> by a party, that the allegations in the petition have been
> proven by clear and convincing evidence, the court shall so

state.

N.C. Gen. Stat. § 7B-807(a) (2021). Indeed, the trial court's conclusion that the

allegations had been proven by clear, cogent, and convincing evidence is simply

confirming that the trial court properly applied the proper standard of proof as

required by law. *See id.* This Court addressed the requirement for the trial court to

"affirmatively state" it applied the correct standard of proof in *In re A.S.*:

> With respect to the merits of the trial court's adjudication of neglect, respondent first argues that the order was inadequate because the court failed to affirmatively state that the allegations in the petition had been proven by clear and convincing evidence as required by the Juvenile Code. Pursuant to N.C. Gen. Stat. § 7B–807 (2007), the court is required to recite the standard of proof the court relied on in its determination of neglect.
>
> Although the "[f]ailure by the trial court to state the standard of proof applied is reversible error[,] . . . *there is no requirement as to where or how such a recital of the standard should be included.*" *In re O.W.*, 164 N.C. App. 699, 702, 596 S.E.2d 851, 853 (2004) (internal citation omitted) (holding that court sufficiently satisfied the requirement of statement of standard of proof by stating the court "CONCLUDES THROUGH CLEAR, COGENT AND CONVINCING EVIDENCE"). Here, the court's order contains the following language: "FROM THE FOREGOING, THE COURT CONCLUDES THROUGH CLEAR, COGENT AND CONVINCING EVIDENCE: . . . ." We find this language sufficient to meet the requirement of N.C. Gen. Stat. § 7B–807.

*In re A.S.*, 190 N.C. App. 679, 688, 661 S.E.2d 313, 319 (2008) (capitalization in

original) (emphasis added), *aff'd per curiam*, 363 N.C. 254, 675 S.E.2d 361 (2009).

Reading the entire order in context, the trial court's conclusion that the "allegations

in the Juvenile Petition have been proven by clear, cogent, and convincing evidence" is simply indicating the trial court applied the proper standard of proof in concluding the child was a neglected juvenile. The trial court obviously did not adopt as part of its findings every single word of the attachment to the petition describing the situation.

The only "allegations" in the juvenile petition that the trial court needed to make findings of fact to support were that Kevin was a "neglected juvenile" in that he did "not receive proper care, supervision, or discipline from [his] parent guardian, custodian, or caretaker" and "live[d] in an environment injurious to [his] welfare." Whether those allegations were "proven by clear, cogent, and convincing evidence[,]" as the conclusion states, relates to Mother's other challenge to the trial court's conclusion of law, to which we now turn.

### 2. *Conclusion Kevin Was a Neglected Juvenile*

Mother also challenges the trial court's conclusion Kevin was a neglected juvenile. As we have already briefly explained above in the section addressing whether parts of finding 8 were actually conclusions of law, a neglected juvenile is, in relevant part: "Any juvenile less than 18 years of age . . . [(1)] whose parent, guardian, custodian, or caretaker does not provide proper care, supervision, or discipline; . . . or [(2)] who lives in an environment injurious to the juvenile's welfare[.]" N.C. Gen. Stat. § 7B-101(15).

Our Courts have added an additional requirement for both relevant parts of the definition of neglected juvenile because the State has "authority . . . to regulate the parent's constitutional right to rear their children, *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), only when 'it appears that parental decisions will jeopardize the health or safety of the child.'" *See In re Safriet*, 112 N.C. App. 747, 752-53, 436 S.E.2d 898, 901-02 (1993) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 233-34, 32 L.E.2d 15, 35 (1972) (discussing additional requirement in relation to the "proper care, supervision, or discipline" part of the definition); *In re K.J.B.*, 248 N.C. App. at 354, 797 S.E.2d at 518 (explaining there is a "[s]imilar[]" requirement for the injurious environment part of the definition). Specifically, there must be a "physical, mental, or emotional impairment[,]" some "harm to the child[,]" or a "substantial risk" of one of those things. *See In re Stumbo*, 357 N.C. at 283, 582 S.E.2d at 258 (requiring a "physical, mental, or emotional impairment of the juvenile or a substantial risk of such impairment as a consequence of the failure to provide proper care, supervision, or discipline" (quoting *In re Safriet*, 112 N.C. App. at 752, 436 S.E.2d at 901-02)); *In re K.J.B.*, 248 N.C. App. at 354, 797 S.E.2d at 518 ("Similarly, in order for a court to find that the child resided in an injurious environment, evidence must show that the environment in which the child resided has resulted in harm to the child or a substantial risk of harm.").

Mother's challenge to the conclusion Kevin was a neglected juvenile relates to this additional requirement. Mother contends the trial court's findings did not

support its conclusion Kevin suffered impairment, harm, or a substantial risk thereof as a result of (1) the lack of proper care, supervision, or discipline, and (2) living in an injurious environment.

We reject Mother's argument; the trial court's findings amply support the conclusion Kevin was at a substantial risk of impairment or harm because of the lack of proper care, supervision, or discipline and because of the injurious environment. The trial court found that following Mr. S's arrest, Kevin, who was only six years old at the time, "was left without a caretaker of any kind." The trial court did not put any timeframe on the period of time Kevin would have been without a caretaker "absent intervention" from the Agency, but the period of time Kevin stood to be without a caretaker appeared to be indefinite at the time of the Agency's intervention based on the circumstances recounted in the findings. First, the father was deceased and therefore could not serve as a caretaker. Second, Mother had been incarcerated from "a few weeks prior to removal" in August 2021 until at least September 2021. Third, the only other people offered as caretakers, Mother's brother and his wife, "indicated they would not be able to provide care for the child." Thus, Kevin faced, in early August 2021, the prospect of an indefinite period of time without any caregiver.

A six-year-old child without a caregiver for an indefinite period of time faces a substantial risk of impairment or harm due to that lack of proper care, supervision, or discipline or due to the injurious environment based on our prior caselaw. For example, in *In re D.C.*, this Court upheld the trial court's conclusion of law that a

sixteen-month-old girl was neglected because she was "exposed to an injurious environment that put her in an unacceptable risk of harm and emotional distress" when she was left alone in a "motel room for more than thirty minutes at four o'clock in the morning." *In re D.C.*, 183 N.C. App. 344, 353, 644 S.E.2d 640, 645 (2007) (brackets omitted). Absent intervention by the Agency, Kevin faced a much longer time without a caregiver than the 30 minutes in *In re D.C.*, which also would necessarily have included many times at night. *See id.* Further, the differences in age and location do not distinguish this case from *In re D.C.* As this Court recently explained in *In re D.S.*, part of the problem with leaving a sixteen-month-old child, in contrast to a newborn, alone in a motel room was that the child "was capable of exploring and encountering various hazards[.]" *In re D.S.*, ___ N.C. App. at ___, 879 S.E.2d at 338, 346 (citing *In re D.C.*, 183 N.C. App. at 351, 644 S.E.2d at 644). Here, absent the Agency's intervention, Kevin would also have been "capable of exploring and encountering various hazards" if left alone without a caregiver, presumably at the house of Mr. S, who had just been arrested for possession of methamphetamine, for an indefinite period of time. *In re D.S.*, ___ N.C. App. at ___, 879 S.E.2d at 346. Therefore, Kevin was also neglected like the child in *In re D.C.* *See In re D.C.*, 183 N.C. App. at 353, 644 S.E.2d at 645.

While the Agency's timely intervention prevented any harm from coming to Kevin from the lack of proper supervision, the substantial risk of harm alone is sufficient to show a child is neglected. "It is well-established that the trial court need

not wait for actual harm to occur to the child if there is a substantial risk of harm to the child in the home." *In re T.S., III*, 178 N.C. App. 110, 113, 631 S.E.2d 19, 22 (2006). As a result, the trial court's findings of fact support its conclusions of law Kevin "suffers from a physical, mental, or emotional impairment or is at a substantial risk of such impairment as a result of living in the injurious environment described above" and "[c]lear, cogent, and convincing evidence exists to support an adjudication of [Kevin] as neglected[.]" Since those two conclusions also cover the same ground as the allegations in the juvenile petition, as discussed above, the trial court's findings of fact also support its conclusion the allegations "have been proven by clear, cogent, and convincing evidence." Finally, after a *de novo* review, we conclude the trial court properly reached those conclusions. Mother's arguments do not convince us otherwise.

Mother argues "the trial court only found that Kevin had been placed with his grandmother, who placed him with Mr. [S], who then was arrested for possession of methamphetamine." Mother then find its "noteworthy that the trial court did not make a finding of fact that Mr. [S] was using illegal substances, much less that Kevin was harmed while in Mr. [S's] care or was at substantial risk of such harm." Finally, Mother contends even if there was a finding Mr. S was using illegal substances, "evidence of a parent's substance abuse is not in and of itself clear and convincing evidence sufficient to support a conclusion that a child is neglected."

Mother's arguments misidentify the source of the potential harm. The substantial risk of harm was not necessarily from Mr. S's care but rather from the total lack of care following Mr. S's arrest. Even if we assume Mr. S was an excellent caregiver, he was not available to care for Kevin after his arrest. While the trial court did not make findings about Kevin being harmed from Mr. S's care, it did find Kevin "was left without a caretaker of any kind" following Mr. S's arrest, absent the Agency's intervention. Mother's focus on potential harm from Mr. S's care is misplaced because the substantial risk of harm supported by the trial court's findings of fact, with which we agree following our *de novo* review, is that Kevin faced the prospect of an indefinite time without a caregiver.

After our review, we determine the trial court's findings of fact support its conclusion of law Kevin was a neglected juvenile. Further, after our *de novo* review of the relevant conclusions of law, the trial court did not err.

### III. Conclusion

The trial court did not err in adjudicating Kevin to be a neglected juvenile. After determining certain findings of fact were actually conclusions of law that needed to be reviewed as such, we determine all the remaining findings of fact were supported by clear and convincing evidence. Further, the trial court's findings of fact supported its conclusions of law; Kevin was a neglected juvenile and suffered a substantial risk of impairment or harm because of the lack of proper care, supervision, or discipline and because of the injurious environment he faced. Under

our *de novo* review of the conclusions of law we further find the trial court did not err in adjudicating Kevin a neglected juvenile. Finally, Mother did not challenge the dispositional portion of the trial court's order. Therefore, we affirm the trial court's adjudication and disposition order.

AFFIRMED.

Judges HAMPSON and GORE concur.